**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Xfinity Mobile, et al., | No. CV-22-01950-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| Globalgurutech LLC, et al., | |
| Defendants. | |

Before the Court are Plaintiff Comcast OTR1, LLC and Comcast Cable Communications, LLC for themselves and their Xfinity Mobile brand and Comcast Corporation's (collectively, "Xfinity") Motion for Partial Summary Judgment and Memorandum of Law in Support (Doc. 214; Doc. 220 (sealed version)) and Defendant Jakob Zahara, Globalgurutech LLC ("GGT"), and Guru Holdings LLC's (collectively "Global Guru") Motion for Summary Judgment and Memorandum of Law in Support (Doc. 209; Doc. 210 (sealed version)). The parties have fully briefed both Motions. (*See* Doc. 222 (Xfinity's Response); Doc. 224 (sealed version); Doc. 225 (Global Guru's Response); Doc. 228 (sealed version); Doc. 234 (Xfinity's Reply); Doc. 236 (sealed version); Doc. 237 (Global Guru's Reply); Doc. 241 (sealed version). The parties have also filed their respective accompanying Statement of Facts ("SOF") and Controverting and Separate Statement of Facts ("CSOF" or "SSOF"). (*See* Doc. 205 (Xfinity's SOF (sealed)); Doc. 212 (Global Guru's SOF (sealed)); Doc. 226 (Xfinity's CSOF & SSOF); Doc. 230 (Global Guru's CSOF & SSOF (sealed)).) The Court, having considered the

parties' briefs and the applicable law, will grant in part and deny in part Global Guru's Motion for Summary Judgment and deny Xfinity's Motion for Partial Summary Judgment.[1]

## I. BACKGROUND

Zahara owns and operates GGT and Guru Holdings LLC. (Doc. 205 ¶ 1.) Global Guru is in the business of buying and selling second-hand phones.[2] (*Id.* ¶ 5; Doc. 212 ¶ 2.) The buying process is relatively straight forward. The seller visits SellLocked.com (previously under the domain name iBuyLocked.com), prompting the seller to select the device he is selling, including iPhones, iPads, Apple Watches, and Galaxy devices. (Doc. 212 ¶¶ 4–5.) The seller then selects the status of the device, e.g., whether the device has "no locks," is "financed" (also referred to as "carrier locked"), is "blacklisted/blocked" (hereafter, "blocklisted"), or "activation locked."[3] (*Id.* ¶ 6.) The seller than clicks through a series of questions about the device. (*Id.* ¶ 7.) One of the questions directs the seller to select a carrier as shown below.



---

[1] Also pending before the Court are Global Guru's Motion for Leave to File Certain Portions of Defendants' Response to Motion for Summary Judgment and Exhibits 4, 5, 10 and 11 of the Response and the Entire Controverting Statement of Facts and Exhibits Under Seal (Doc. 227) and Xfinity's Motion for Leave to Seal Plaintiffs' Reply in Support of Motion for Partial Summary Judgment (Doc. 235). Good cause appearing, the Court will grant both Motions.

[2] The parties dispute whether Global Guru LLC's involvement in Zahara and GGT's business of buying and selling phones. For purposes of this Order, the Court refers to the Defendants as Global Guru collectively for clarity but does not intend to suggest corporate or business affiliation related to the disputes in this case unless otherwise noted.

[3] A "financed" device refers to devices that have a remaining balanced owed to a carrier, like Xfinity, manufacturer, or another company. A "blocklisted" device refers to those that a carrier or another company remotely locks, preventing its use. A "activation locked" device refers to devices that are demo models, locked to the activation screen, locked by a passcode, locked to an iCloud account, or has a mobile device management lock.

1    (*Id.*; Doc. 205 ¶ 18.)[4]  After answering the questions, the seller receives an offer from

2    Global Guru.  (Doc. 212 ¶ 7.)  If the seller accepts the offer, he or she then mails the device

3    to Global Guru which proceeds to assess the condition and status of the device.  (*Id.*

4    ¶¶ 14–15.)  That process involves checking the International Mobile Equipment Identity

5    ("IMEI") number to confirm the device status is correct, e.g., financed or blocklisted,

6    whether the device is new or used, e.g., in its original packaging or damaged, and the

7    carrier.  (Doc. 205 ¶ 47; *see also* Doc. 207-4; Doc. 207-5.)  If the device is in the condition

8    the seller represented, Global Guru will then submit payment to the seller.  (Doc. 212

9    ¶ 16.)[5]  If the device is in a different condition, Global Guru adjusts the offer to reflect the

10    condition and status of the phone, which the seller could then accept or have the device

11    sent back.  (Doc. 205 ¶ 47.)  Global Guru, through GGT, then sells the devices in

12    international markets where buyers can purchase the devices for a lower price than if they

13    had bought them from a manufacturer or carrier directly.  (Doc. 205 ¶¶ 11–13.)

14          Global Guru utilizes search engine optimization to drive sellers to its website by

15    increasing the likelihood that a seller will come across the website, i.e., by googling various

16    words or phrases.  (Doc. 230 ¶ 30.)  Essentially, Global Guru has a marketing company

17    provide analytics and guidance on key words and phrases that searchers often use online,

18    which enables Global Guru to target those words and phrases using organic and paid

19    searches.  (Doc. 207-10 at 7–10.)  Paid searches generally involve Global Guru bidding on

20    the amount it was willing to pay for each time searchers click a keyword online.  (Doc.

21    230-11 at 2.)  Global Guru's marketing strategy sought out sellers looking to sell

22    blocklisted and financed devices.  (Doc. 205 ¶¶ 34, 41; Doc. 230 ¶¶ 46, 54; *see also* Doc.

23    206-6 at 2–3.)[6]

---

24    [4] Xfinity holds a federal registered trademark to the Xfinity logo depicted in the selection menu.  (Doc. 205 ¶ 17.)

25    [5] Global Guru does not require the seller to provide any documentation proving ownership of the device.  (Doc. 205 ¶ 46.)

26    [6] For example, Global Guru would hire a marketing firm to create blog posts that utilize keywords in the headlines and bodies, so when people search for the relevant subject,

27    Global Guru's website is more likely to populate on the search engine and appear more prominently in the list of search results.  (*See* Doc. 205 ¶¶ 13, 24; *e.g.*, Doc. 206-6 at 2–7; Doc. 206-7 at 2–5; Doc. 206-8 at 2–6.)  Global Guru utilized one such blog post titled "Can

28    you sell a phone that isn't paid off?"  (Doc. 205 ¶ 13; Doc. 230-5 at 1–3.)  Additionally, if

Xfinity does not have any affiliation, either through sponsorship or endorsement, with Global Guru. (Doc. 205 ¶ 4.) Xfinity sells various devices, including Xfinity branded phones, and provides wireless services under the Xfinity Mobile Network. (Doc. 212 ¶ 30.) When customers purchase a phone from Xfinity, they can pay in full or pay under an installment plan. (*Id.* ¶ 31.) The latter relates to financed phones, which Xfinity sells under contracts, including Installment Contracts and Terms and Conditions. (*Id.* ¶ 27.) These contracts require the buyer to only use Xfinity's wireless service and to pay the relative installments on the device and monthly service fees. (*Id.*) The contracts also prohibit the buyer from reselling the phone. (*Id.*) An essential part of Xfinity's business model is to provide favorable financing terms for the devices to entice customers who then subscribe to the wireless service and pay the month-to-month fees. (Doc. 205 ¶¶ 28–29; Doc. 230 ¶¶ 38–39.)

Global Guru has bought and sold at least 500 Xfinity phones. (Doc. 212 ¶ 33; Doc. 226 ¶ 33.) Some of these phones included blocklisted phones that were listed as fraudulently obtained or lost or stolen. (Doc. 205 ¶ 40; Doc. 230 ¶ 53; *see also* Doc. 205-3 at 39, 40; Doc. 230-1 at 4; Doc. 230-12 at 15.) For fraudulently obtain devices, fraudsters can purchase a device from Xfinity under a false identity with no money down and immediately turn around and sell the device. (Doc. 205 ¶ 8; Doc. 230 ¶ 14.) Fraudsters may also pose as the account holder to charge the cost of the phone to the account and then sell it for pure profit. (*Id.* ¶ 8; Doc. 230 ¶ 14.)

Based on Global Guru's purchases and sales, Xfinity filed this lawsuit. Xfinity's SAC asserts ten counts against Global Guru: (1) Unfair Competition (Count I); (2) Tortious Interference with Business Relationships and Prospective Advantage (Count II); (3) Tortious Interference with Contractual Relations (Count III); (4) Unjust Enrichment (Count IV); (5) Common Law Fraud and Fraudulent Misrepresentation (Count V); (6) Trafficking in Computer Passwords under 18 U.S.C. § 1030(a)(6) (Count VI); (7) Unauthorized Access

---

a searcher entered the phrase "who buys blacklisted Xfinity phones," a link titled "Sell blacklisted Phone" populates as the first link in the list and directs the searcher to SellLocked.com. (*See* Doc. 229 at 2.)

under 18 U.S.C. § 1030(a)(5)(C) (Count VII); (8) Unauthorized Access with Intent to Defraud under 18 U.S.C. § 1030(a)(4) (Count VIII); (9) Federal Trademark Infringement under 15 U.S.C § 1114 (Count IX); and (10) Federal Common Law Trademark Infringement under 15 U.S.C. § 1125(a)(1)(A) (Count X).  (*See generally* Doc. 143.)

Xfinity now moves for summary judgment on Counts I, II, III, IV, IX, X.  (Doc. 214.)  Global Guru also moves for summary judgment that Xfinity does not have standing to bring any of the claims and otherwise moves on the merits of all ten counts.  (Doc. 209.)

## II.    LEGAL STANDARD

Summary judgment is appropriate in circumstances where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of a case under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are genuine when the evidence could allow a reasonable jury to find in favor of the nonmoving party.  *Id.*  Summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The court views "the evidence presented through the prism of the substantive evidentiary burden" that applies at trial.  *Anderson*, 477 U.S. at 254.  And must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The court must draw all reasonable inferences in the nonmovant's favor but must not weigh the evidence or make credibility determinations.  *Anderson*, 477 U.S. at 253, 255.

The movant carries the initial burden to demonstrate the basis for a motion for summary judgment, and "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; Fed. R. Civ. P. 56(c)(1)(A)–(B).  If this initial burden is not met, the nonmovant does not need to produce anything even if it would have the ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).

1    However, if the movant meets its burden, the nonmovant then has the burden of
2    establishing that there is a genuine issue of material fact. *Id.* at 1103. The nonmovant
3    "must do more than simply show that there is some metaphysical doubt as to the material
4    facts." *Zenith Radio Corp.*, 475 U.S. at 586. Bare assertions alone do not create a material
5    issue of fact, and "[i]f the evidence is merely colorable, or is not significantly probative,
6    summary judgment may be granted." *Anderson*, 477 U.S. at 247–50 (citations omitted).

7    **III.    DISCUSSION**
8        **A. Standing**

9        Standing requires a plaintiff to have (1) suffered an injury in fact that is (a) concrete
10   and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) that is
11   caused by the defendant, i.e., the injury must be fairly traceable to the challenged action;
12   and (3) it must be likely, as opposed to speculative, that a favorable ruling would redress
13   the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 650–51 (1992) ("The party invoking
14   federal jurisdiction bears the burden of establishing these elements."). Plaintiffs must
15   demonstrate standing for each claim and for each form of relief they seek. *TransUnion*
16   *LLC v. Ramirez*, 594 U.S. 413, 431 (2021). Article III standing is an indiscernible part of
17   a plaintiff's case and "must be supported at each stage of litigation in the same manner as
18   any other essential element of the case. *Cent. Delta Water Agency v. United States*, 306
19   F.3d 938, 947 (9th Cir. 2002). At the summary judgment stage, a plaintiff "need only
20   establish a genuine dispute as to these requirements to survive summary judgment."
21   *Juliana v. United States*, 947 F.3d 1159, 1168 (9th Cir. 2020); *see also Cent. Delta Water*
22   *Agency*, 306 F.3d at 947 ("plaintiffs need not establish that they in fact have standing, but
23   only that there is a genuine question of material fact as to the standing elements."). When
24   the material factual disputes underlying the standing issue are intertwined with an element
25   of the merits of the claim, the court must leave the resolution to the trier of fact. *Bowen v.*
26   *Energizer Holdings, Inc.*, 118 F.4th 1134, 1144–45 (9th Cir. 2024).

27       Global Guru broadly argues that Xfinity lacks standing to bring its claims but does
28   not fashion any particular arguments to a specific claim. (Doc. 210 at 5–7.) Xfinity

contends that it has a legally protectable interest in its trademark rights, contractual relationships with current and prospective customers, and contractual and financial rights to the financed Xfinity phones. (Doc. 224 at 3–4.) Xfinity further contends that Global Guru's buying and selling scheme caused the injuries to its protectable interests and injunctive relief or damages will redress the injuries. (*Id.*) Xfinity also identifies its claims under the standing standard. (*Id.* at 6–16 nn.5–9.)

Global Guru has failed to carry its initial burden to raise the standing issue on most of the claims. Rule 56 states:

> A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the [record],' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Global Guru has failed to identify each relevant claim and the elements of standing that are purportedly lacking. And, in reply to Xfinity identifying the relevant elements of standing for its claims, Global Guru made zero effort to address standing for most of the claims except for unjust enrichment, trafficking in computer passwords, unauthorized access, and unauthorized access with intent to defraud claims. Therefore, Guru has failed to establish that it is entitled to judgment as a matter of law on whether Xfinity has standing to bring the claims for unfair competition, trademark infringement, common law trademark infringement, tortious interference with business relationships and contractual relations, and common law fraud and misrepresentation. The Court will evaluate standing for the remaining claims.

### 1. Unjust Enrichment

Global Guru asserts a theory that Xfinity does not retain title to the phones, and therefore lacks standing to assert a claim based on harms caused by third parties. (Doc. 241 at 7–8; *see also* Doc. 210 at 5–7.) Global Guru also argues that Xfinity has failed to

demonstrate a causal connection between the harm it has suffered, third parties stealing phones, and the benefit purportedly conferred by Xfinity on Global Guru.  (Doc. 241 at 7–8.)  Xfinity alleges that it has standing because it was injured when: (1) customers breach their finance and service contracts under which money is owed or when devices are stolen; (2) the breach and injury are directly and inversely related to Global Guru's profits derived from the business of buying phones at a discount that are under contract or obtained through fraud; and (3) repayment of the profits will remove the improper benefit Global Guru received.  (Doc. 224 at 11 n.7.)

Global Guru oversimplifies Xfinity's theory and errs by focusing on the phones themselves and whether Xfinity retains title as the basis for Xfinity's alleged harm under the claim.  (*See* Doc. 241 at 7–8.)  Unjust enrichment pertains to situations where "one party has and retains money or benefits that in justice and equity belong to another." *Trustmark Ins. Co. v. Bank One, Ariz.*, 48 P.3d 485 (Ariz. Ct. App. 2002), *as corrected* (June 19, 2002).  From what the Court can glean, the basis for Xfinity's injury is the harm stemming from the unjust enrichment itself.  *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (noting an injury in fact includes monetary injuries); *see also Freeman v. Sorchych*, 245 P.3d 927, 938 (Ariz. Ct. App. 2011) (providing the elements of an unjust enrichment claim, which includes an enrichment to the defendant and a detriment to the plaintiff).  Xfinity appears to contend that it provides phones at a discounted price, including through applying credits to the customer's accounts to provide the discount over the term of the agreement, which in turn entices the customer to enter and maintain a monthly service agreement that is paid throughout the term of the installment contract.  For example, as evidence related to its trademark claims, Xfinity produced evidence that a customer had obtained a phone for "$0 via 24 months of credits" and wanted to keep the line open to continue receiving the credits.  (Doc. 206-2 at 2; *see also* 205-3 ¶ 7 (explaining Xfinity subsidizes phones for twenty-four months and recoups the value of the phone through financing payments or monthly service fees); Doc. 226-3 at 15 (noting device credits spread out as monthly credits on the customer's bill over the

term of the agreement).)  A customer utilizing this scheme can then turn around and sell that device to Global Guru, which buys the device at a discount compared to the price it would have paid to Xfinity for the phone and had the promotional discounts not applied. Global Guru then earns a profit after selling the devices at a slightly marked-up price.  On the other side, Xfinity could have sold the phone at full price had it known the customer or fraudster did not intend to use the phone on the service line.  Whether Xfinity has a claim against the customer or a fraudster for the value of the device sold, when the purpose of the promotional discount was to secure that service line, is a separate issue from the harm alleged here.  At bottom, Xfinity's theory relates to the benefit Global Guru receives—the profits—brought about by Xfinity's detriment—providing a phone to a customer for a reduced cost, or no cost at all, to facilitate bringing the customer under a service agreement when Xfinity could have retained the device and sold it at the full price.

There is no dispute that the customer's agreements prohibit reselling financed devices.  (Doc. 205 ¶ 27; Doc. 230 ¶ 37.)  There is also no dispute that Global Guru utilized search engine optimization to target sellers who were searching to sell financed or blocklisted devices.  (*See* Doc. 205 ¶¶ 34, 41; Doc. 230 ¶¶ 46, 54; *see also* Doc. 206-6 at 2–3.)  And at least some of the phones that Global Guru has purchased and sold include phones that were financed, blocklisted, or obtained through fraud.  (*See* Doc. 205 ¶ 40; Doc. 230 ¶ 53; *see also* Doc. 205-3 at 39, 40; Doc. 230-1 at 4; Doc. 230-12 at 15.)  Global Guru does not dispute that it earns a profit from these sales.  (*See* Doc. 205 ¶¶ 50–51; Doc. 230 ¶¶ 67–68.)  Xfinity has provided a declaration attesting to the fact that provides the financial incentives through financed phones to promote customer retention and further profits from mobile service contracts.  (Doc. 205-3 ¶¶ 7–11.)  Additionally, when bad actors or fraudsters obtain the phones, Xfinity refunds the defrauded customer and absorbs the costs and loses revenue under the finance and service agreements.  (*Id.*); *Lujan*, 504 U.S. at 651 (noting that in response to a summary judgment motion, a plaintiff must set forth specific facts by affidavit or other evidence, which for purposes of the motion are taken as true, and at the final stage, those facts must be supported by adequate evidence at

trial).

Under these facts and Xfinity's theory of harm, the injury relating to Global Guru's profit from the sale of financed and fraudulently obtained phones at Xfinity's expense from absorbing associated costs and lost revenues is fairly traceable to the sale that effectuates the harm. Global Guru does not dispute the third element, and the Court finds no reason to question that relinquishment of such profits would not redress the injury to Xfinity. Therefore, the Court finds Xfinity has carried its burden of establishing specific facts supporting the elements of standing to bring the unjust enrichment claim.

2. <u>Trafficking in Computer Passwords & Unauthorized Access Claims</u>

Global Guru contends that Xfinity lacks standing to bring the trafficking in computer passwords, 18 U.S.C. § 1030(a)(6), unauthorized access, *id.* § 1030(a)(5)(C), and unauthorized access with intent to defraud, *id.* § 1030(a)(4), claims because Xfinity no longer owns the phones and there is only liability where Global Guru knowingly accesses a computer without or exceeding authorization. (Doc. 241 at 11.) Xfinity argues that it has standing because (1) it is injured by the trafficking of information that enables unauthorized access to its network that creates security vulnerabilities and dilutes the value of access for actual customers creating a competitive disadvantage; (2) Global Guru's practice of obtaining unauthorized access devices and selling them causes the security and commercial disadvantages; and (3) the Computer Fraud and Abuse Act ("CFAA") is specifically tailored to provide redress. (Doc. 224 at 16 n.9.)

Global Guru provides negligible analysis and reasoning on this issue. Once again it harps on the ownership of the device at the time of sale but overlooks the harm that is the basis for the claim. The injury is the harms resulting from Global Guru accessing the Xfinity Mobile Network via the devices to unlock them. Although the Court doubts Global Guru carried its initial burden, Xfinity has provided a declaration that establishes the devices provide access to its network, which other computers administer. (Doc. 229-5 ¶¶ 5–6.) Xfinity also provided another declaration indicating losses it incurred from hiring an investigator in responding to the alleged offense. (*See* Doc. 224 at 17–18 n.10; Doc.

232-2 ¶¶ 3–4; *see also* Doc. 205-7 ¶ 2.)  Notably, however, it is unclear what exactly that investigation revealed.  But assuming Global Guru carried its initial burden, and in taking the declaration as true and viewing the facts in Xfinity's favor, so too has Xfinity.  Xfinity has provided unrefuted evidence that Global Guru has accessed its network to unlock the carrier, and Xfinity has incurred monetary costs in investigating the issue that is redressable with economic damages.  Therefore, the Court finds that Xfinity has carried its burden to establish facts that support standing to assert these claims.

### B.  Unfair Competition, Trademark Infringement, & False Association Claims

Both parties move for summary judgment on these three claims.  (Doc. 210 at 7–12; Doc. 220 at 5–9.)  The Lanham Act creates a federal cause of action for trademark infringement.  *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 147 (2023).  For the typical case for infringement of a registered mark, 15 U.S.C. § 1114(a)(1) imposes liability on a defendant in relevant part where it uses a registered mark in commerce in connection with the sale or advertisement of any services or in connection with such use that is likely to cause confusion, mistake, or to deceive.  For unregistered marks, 15 U.S.C. § 1125(a) provides for a false association claim that imposes liability on a defendant in relevant part where it uses any name, term, or symbol in connection with any goods or services that is likely to cause confusion, mistake, or to deceive as to the affiliation, connection, or association of the defendant with another person or as to the origin, sponsorship, or approval of its goods, services, or commercial activities by another person.  15 U.S.C. § 1125(a)(1)(A); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014).  For both claims, courts apply a likelihood-of-confusion test that asks whether a "reasonably prudent customer" in the marketplace is likely to be confused as to the origin of the services used in connection with the mark.  *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 935 (9th Cir. 2015) (citation omitted) (noting the confusion "must be probable, not simply a possibility" (citation omitted)).  The test generally does not require a plaintiff to prove instances of actual confusion.  *Brookfield Commc'ns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1050 (9th Cir. 1999).

Under Arizona law, the common law theory of unfair competition encompasses several tort theories including trademark infringement, false advertisement, "palming off," and misappropriation. *Fairway Constructors, Inc. v. Ahem*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998).[7]   The gravamen of an unfair competition claim is confusion to the public. *Taylor v. Quebedeaux*, 617 P.2d 23, 25 (1980).   Arizona's standard overlaps with the federal trademark likelihood-of-confusion test, which leads courts to combine the analysis and consider them together. *Health Indus. Bus. Commc'ns Council Inc. v. Animal Health Inst.*, 481 F. Supp. 3d 941, 956 (D. Ariz. 2020) (noting the claims are "substantially congruent").

Global Guru argues that there is no evidence to support the allegation that it uses the mark in the selling side of its business, its use is permissible under the nominative fair use doctrine, it does not target Xfinity phone owners with its marketing or advertisements, and there is no evidence to support that customers confuse its services with Xfinity's. (Doc. 210 at 8–12.)  According to Global Guru, its online marketing channels to buy devices are distinct and separate from Xfinity's online marketing channels to sell the devices. (Doc. 228 at 5–6.)  Global Guru also broadly posits that there is no basis for liability under 15 U.S.C. § 1114(1)(a) for using a trademark in the process of buying goods rather than selling goods. (Doc. 210 at 8–12.)

Xfinity argues that under the factors enumerated in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), Global Guru's use of the mark creates a likelihood of confusion about the affiliation between the parties and there is evidence of Global Guru using the mark to advertise and market its services. (Doc. 220 at 5–9; Doc. 224 at 6–9.)[8]

---

[7] Xfinity's Complaint does not clarify the law that its unfair competition claim arises under, but its briefing cites cases addressing Arizona common law, so the Court construes the claim accordingly. (Doc. 142 ¶¶ 161–64; Doc. 220 at 5 (citing *Doe v. Ariz. Hosp. & Healthcare Ass'n*, No. CV 07-1292-PHX-SRB, 2009 WL 1423378, at *11 (D. Ariz. Mar. 19, 2009)).)

[8] Xfinity also argues that based on this Court's prior Order granting it leave to amend its Complaint, the nominative fair use defense is unavailable. (Doc. 220 at 5–9 (citing Doc. 131).)  To clarify, the Court's statement was in the context of whether the nominative fair use defense would render leave to amend futile based on Xfinity's arguments that Global Guru used more of the mark that necessary, not that it was barred all together or that Xfinity was alleviated of its burden of proof as the litigation progressed. (Doc. 131 at 7–9.)  In attempting to address this Court's other Order dismissing the claims based on the

1    Xfinity disagrees that there is no liability for using the mark to buy devices and that the

2    parties' marketing channels are distinct because Xfinity also offers money to customers

3    that trade-in their old devices when purchasing new ones.  (Doc. 220 at 5–9; Doc. 236

4    at 2–3; *see also* Doc. 234-1 at 2–7.)

5          The Court begins with the issue surrounding the nominative use defense.  The

6    defense "protects a defendant 'where the use of the trademark does not attempt to capitalize

7    on consumer confusion or to appropriate the cachet of one product for a different one.'"

8    *Adobe Sys. Inc. v. Christenson*, 809 F.3d 1071, 1081 (9th Cir. 2015) (quoting *New Kids on*

9    *the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 306–08 (9th Cir. 1992)).  A defendant

10   seeking to invoke the defense "need only show that it used the mark to refer to the

11   trademarked good."  *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1183 (9th

12   Cir. 2010).  Global Guru's use of the mark undoubtably refers to devices on the Xfinity

13   network, not Global Guru's goods, and the ultimate concern is whether that use causes

14   confusion over whether Xfinity has endorsed or sponsored Global Guru's venture of

15   buying devices affiliated with the Xfinity brand.  *See Adobe Systems*, 809 F.3d at 1081.  To

16   that end, the test in *Toyota Motor Sales* replaces the *Sleekcraft* test to measure likelihood

17   of customer confusion.  *Id.*

18         The *Toyota* test asks whether (1) the product was readily identifiable without use of

19   the mark; (2) defendant used more of the mark than reasonably necessary; or (3) defendant

20   falsely suggested he was sponsored or endorsed by the trademark holder.  610 F.3d

21   at 1175–76 ("The third factor speaks directly to the risk of such confusion, and the others

22   do so indirectly.").  If the answers to all three are negative, then there is no infringement.

23   *Applied Underwriters, Inc. v. Lichtenegger*, 913 F.3d 884, 893 (9th Cir. 2019); *but see*

24   *Toyota Motor Sales*, 610 F.3d at 1176 (noting that if the factors are not met, the Court may

25   order defendants to modify their use to satisfy all three).  The plaintiff always carries the

26   burden of proving likelihood of confusion and must establish that the defendant's use of

27   the mark was not nominative fair use.  *Toyota Motor Sales*, 610 F.3d at 1182–83 ("A

28   _____

nominative fair use defense, (*see* Doc. 77 at 4–7), the Court seemingly added to the
confusion.  The Court's analysis in this Order will seek to dispel any confusion.

finding of nominative fair use is a finding that the plaintiff has failed to show a likelihood of confusion as to sponsorship or endorsement.").[9]

Xfinity has not argued that any of its devices are identifiable by means other than referring to the Xfinity name itself without venturing into absurd descriptive phrases. *See, e.g.*, *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 802 (9th Cir. 2002) (agreeing under the first prong of the test that there was no practical way for the defendant to identify her title as "Playboy Playmate of the Year 1981" without venturing into absurd descriptive phrases in avoidance of using the trademarked title). Global Guru certainly uses the mark to identify the carrier of a device for purposes of categorizing the phones to make an offer to the customer. Therefore, Xfinity fails to carry its burden to refute that Global Guru's use meets the first factor.

Xfinity has maintained that Global Guru could have used only words in a list rather than the stylized mark to identify the carriers. Under the second factor, the Ninth Circuit has noted that "[c]onsumers may reasonably infer sponsorship or endorsement if a company uses . . . 'more' of a mark than necessary." *Toyota Motor Sales*, 610 F.3d at 1176. And further, that the factor implicates the nature of the defendant's use. *Applied Underwriters*, 913 F.3d at 895. This Court, in applying the *Toyota* test, has found that using a stylized logo or distinctive lettering is not automatically dispositive. *See Aviva USA Corp. v. Vazirani*, 902 F. Supp. 2d 1246, 1264–65 (D. Ariz. 2012) (finding the defendant's use of a mark met the second factor despite using the stylized logo and distinctive coloring because the defendant used the mark to criticize the trademark holder, cutting against the inference of sponsorship or endorsement), *aff'd*, 632 F. App'x 885 (9th Cir. 2015). While the criticism in *Aviva* is factually distinct, the inquiry remains on whether the nature of Global Guru's use "inspire[s] a mistaken belief on the part of consumers that the speaker is sponsored or endorsed by the trademark holder." *Id.* at 1265 (quoting *Toyota Motor Sales*, 610 F.3d at 1176).

---

[9] Given Xfinity's reliance on the Court's previous Order it argued likelihood of confusion under the *Sleekcraft* factors, the Court will construe its arguments and allegations under the appropriate framework.

While the second factor is a close call, the evidence demonstrates that the nature of Global Guru's use of the stylized mark is not to attract customers in an advertising or marketing sense. *Cf. Toyota Motor Sales*, 610 F.3d at 1175, 1178–81 (taking issue with the auto-broker that used Lexus' stylized logo, "Lexus" in its domain names, photographs of Lexus vehicles on its website, and that specialized in and encouraged purchases of Lexus vehicles over other manufacturers). Customers may reach SellLocked.com—an unaffiliated domain name—through Global Guru's keyword search optimization, but the customer does not actually see the stylized mark until he or she engages in the click-through process to receive an offer for the value of the phone. Even then, the stylized mark is juxtaposed among various carriers without any indicia of favoritism for Xfinity devices. To assume use of the mark suggests sponsorship or endorsement from Xfinity would require the same to be true for each individual carrier for which Global Guru has copied their marks. *See id.* at 1176 (explaining that the test is ultimately "designed to address the risk that nominative use of the mark will inspire a mistaken belief on the part of consumers that the speaker is sponsored or endorsed by the trademark holder").

Xfinity's proffered evidence of actual confusion consists of a declaration from one of its representatives and an inquiry from the customers that received a phone for $0 discussed previously. (Doc. 205 ¶ 20.) The declaration provides that Xfinity has received complaints from customers and prospective customers about purchases made from companies, like Global Guru, and expressed general confusion about whether the companies are affiliated. (Doc. 205-3 ¶ 15.) It is not clear if these vague complaints relate to particular Global Guru customers, rather than similar companies generally, and it is further unclear if that confusion is attributable to use of the trademark in any way. The declaration, on its own, does not establish a genuine dispute about whether Global Guru's use of the mark is likely to cause confusion.

The customer's inquiry relates to a question about whether Global Guru would notify Xfinity if the phone was accepted because the customer purchased the phone for "$0 via 24 months of credits" and wanted to keep the line open to continue receiving the credits.

1    Viewed in context, the customer appears to have sought to confirm that Global Guru was

2    in fact not affiliated with Xfinity to ensure that he continued to receive the credits from

3    Xfinity because, as it is undisputed and reasonable to assume, resale of the device in the

4    secondary-market would have violated the customer's financing agreement with Xfinity.

5    That's not customer confusion, that's customer avoidance.[10]   This evidence does not

6    substantiate the declaration, and it does not show any confusion attributable to the customer

7    viewing the stylized mark.

8        Viewed even in Xfinity's favor, any inference from the evidence leads to

9    unwarranted and unembellished speculation that customer confusion is merely possible,

10    but not likely.  *See Lakeside–Scott v. Multnomah County*, 556 F.3d 797, 802–03 (9th Cir.

11    2009) (noting courts need not draw inferences based solely on speculation).  Despite the

12    Court previously finding that nominative fair use was not available to render leave to

13    amend the claims futile, (*see* Doc. 131 at 9), at this stage, Xfinity has failed to carry its

14    burden in establishing evidence that use of the mark causes a likelihood of confusion.  *See*

15    *Toyota Motor Sales*, 610 F.3d at 1182.  For the same reasons as the second factor, the Court

16    finds under the third factor and there is no basis to find Global Guru's use of the mark

17    suggested Xfinity's sponsorship or endorsement.  *See Applied Underwriters*, 913 F.3d at

18    893.   Accordingly, nominative fair use applies, precluding Global Guru's liability for

19    infringement and false association.  *See Toyota Motor Sales*, 610 F.3d at 1183 n.11

20    ("Nominative fair use . . . represents a finding of no liability.").   Additionally, because

21    nominative fair use "does not implicate the source-identification function that is the

22    purpose of trademark, it does not constitute unfair competition," and Xfinity's unfair

23    competition claim fails.  *New Kids on the Block*, 971 F.2d at 308; *see also Health Industry*

24    *Business Communications Council*, 481 F. Supp. at 956 (noting that unfair competition

25    claims under state law are essentially the same as those under the Lanham Act and share

---

26    [10] Xfinity raised additional arguments of dilution and reputational harm.  Xfinity, however,
27    did not raise separate claim for trademark dilution.  *See* 15 U.S.C. § 1125(c)(1).   The
      Lanham Act does not require a plaintiff to establish a likelihood of confusion for a
      trademark dilution claim.  *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir.
28    2008).  Whether there is dilution in this case is not squarely before the Court and customer
      confusion is not relevant to that analysis to inform the Court's inquiry.

the same analysis).  The Court will grant summary judgment in Global Guru's favor, deny summary judgment for Xfinity, and dismiss the claims.

### C. Tortious Interference

Both parties move for summary judgment on the tortious interference claims. Tortious interference requires a plaintiff to establish: "the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted."  *Dube v. Likins*, 167 P.3d 93, 98 (Ariz. Ct. App. 2007) (citation omitted).

The crux of the parties' dispute is whether Xfinity has shown that the customers who sold phones to Global Guru were also Xfinity customers, as opposed to third-party sellers, and even if the sellers were Xfinity customers, whether Xfinity has established a valid contractual relationship exists.  (*See, e.g.*, Doc. 228 at 6.)  Xfinity's claims blur the distinction between claims for the tort of intentional interference with contract and tortious interference with contractual relations or with business expectancies.  (*See* Doc. 143 at 22–25.)  The parties have not provided the Court with any case law that clarifies if evidence of an actual contract with a particular customer is required.  Xfinity did not present evidence relating to specific customer's agreements, and instead analyzes its claims based on the Terms and Conditions generally as evidence for an apparent class or classes of customers—those with financing agreements or service agreements, or both.  (*See* Doc. 224 at 9–10.)

"[T]ortious interference with a business expectancy covers situations that the tort of intentional interference with a contract does not, the former has only been available in those situations where the plaintiff can identify the specific relationship with which the defendant interfered."  *Dube*, 167 F.3d at 101 (requiring obstruction to "some precise business expectancy or contractual relationship" (citation omitted)).  Xfinity has not attempted to identify any specific customer contract that Global Guru interfered with to support a claim

based on the tort of intentional interference with contract and has not provided the Court with any authority to support this type of claim without showing the contract exists. *Cf. Pasco Indus., Inc. v. Talco Recycling, Inc.*, 985 P.2d 535, 547 (Ariz. Ct. App. 1998) (finding a claim for tortious interference with contract requires establishing that there is a contract between the plaintiff and a third party); *True Freight Logistics LLC v. Glob. Tranz Enters. Inc.*, No. CV-18-01472-PHX-JGZ, 2019 WL 11840292, at *4 n.4 (D. Ariz. Jan. 11, 2019) ("[A] claim of tortious interference with contract requires the existence of a contract between the plaintiff and a third party."). Therefore, assuming Xfinity intended for its tortious interference claim to cover interference with contract, as opposed to interference with contractual relations or business expectancies, the claim fails.

Regarding Xfinity's tortious interference with contractual relationships or business expectancies claims, courts permit a plaintiff to allege an expectancy against a class of individuals but only where the group is specifically identifiable. *Dube*, 167 P.3d at 101 (relating pleading requirements); *Edwards v. Anaconda Co.*, 565 P.2d 190, 192 (Ariz. Ct. App. 1977). Xfinity has identified the classes of customers as those under installment contracts or service agreements or both. (Doc. 236 at 4.) This may be sufficient for pleading a claim, but at this stage Xfinity must show evidence of an "actual and identifiable understanding or agreement that in all probability would have been completed without the defendant's interference." *Id.* at 101; *Tresona Multimedia LLC v. Legg*, No. CV-14-02141-PHX-DGC, 2015 WL 470228, at *10 (D. Ariz. Feb. 4, 2015).

Xfinity's expectancy is that the customers will continue follow through on payments under the installment contracts and remain as service subscribers during the term of the installment contracts. (*See* Doc. 236 at 4.) Xfinity has provided no evidence that any customer failed to meet its business expectancies. Xfinity points to the same customer that the Court addressed previously who had inquired about selling his Xfinity device that was under an installment plan but sought to keep his line open. (*See id.*) There is no evidence to suggest that this customer did not continue to pay for his service line through the remainder of the term, thus Xfinity failed to establish is suffered damages from an

1    interference with this customer.  Xfinity also points to evidence of an individual selling a

2    device to Global Guru and stating that she will likely not make payments on the phone.

3    (*See* Doc. 226 ¶ 14.)  This evidence may go to Global Guru's knowledge of the business

4    relationships or expectancies, but the evidence does not show the individual is an Xfinity

5    customer, nor that she failed to pay an installment related to the device or the wireless

6    service.  (*See* Doc. 231-5 at 54; Doc. 232-4 at 55.)  This evidence would require the Court

7    to speculate that the individual is actually an Xfinity customer and that even after selling

8    the phone to Global Guru, she was unable make payments.

9        Global Guru notes that the record identifies over 500 phones that it had purchased

10   from unidentified parties but argues that Xfinity has not tied any of these transactions to a

11   particular customer or relationship.  (*See* Doc. 241 at 5.)  Rather than tie any of those

12   phones to a failure to pay on the contracts or expected service agreements related to those

13   phones, i.e., connect the dots between a relationship or expectancy, the interference, and

14   resulting damages relating to that relationship or expectancy, Xfinity opted for

15   generalizations and speculation to argue its evidence support its claims.  Its evidence is

16   unavailing and highlights further gaps in Xfinity's evidence overall.  Therefore, Xfinity

17   has failed to establish a genuine dispute of fact to sustain its claims for tortious interface

18   with contract, contractual relations or business expectancies.  The Court will grant

19   summary judgment in Global Guru's favor a dismiss the claims.

20       **D. Unjust Enrichment**

21       A claim for unjust enrichment requires a plaintiff to show: "(1) an enrichment, (2)

22   an impoverishment, (3) a connection between the enrichment and impoverishment, (4) the

23   absence of justification for the enrichment and impoverishment, and (5) the absence of a

24   remedy at law."  *Span v. Maricopa Cnty. Treasurer*, 437 P.3d 881, 886 (Ariz. Ct. App.

25   2019); *Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011) ("[A] plaintiff must

26   demonstrate that the defendant received a benefit, that by receipt of that benefit the

27   defendant was unjustly enriched at the plaintiff's expense, and that the circumstances were

28   such that in good conscience the defendant should provide compensation.").  A "party may

be liable to make restitution for benefits received, even though he has committed no tort and is not contractually obligated to the plaintiff." *A Flooring Sys., Inc. v. Radisson Grp., Inc.*, 772 P.2d 578, 581 (Ariz. 1989); *see also Baughman v. Roadrunner Commc'ns, LLC*, No. CV-12-565-PHX-SMM, 2014 WL 3955262, at *4 (D. Ariz. Aug. 13, 2014) ("[T]he essence of an unjust enrichment claim is that there is no direct relationship between the parties under which the plaintiff may recover.").

The parties generally dispute whether Xfinity must directly confer the benefit to Global Guru so that there are no steps in between the benefit received and the detriment. (*See* Doc. 236 at 9; Doc. 241 at 8.)  The parties have not provided, nor has the Court located, any cases directly on point for the circumstances of this case.  As a general matter, "[a] person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person." *Advance Leasing & Crane Co. v. Del E. Webb Corp.*, 573 P.2d 525, 452–53 (Ariz. Ct. App. 1977) (quoting and relying on Restatement (First) of Restitution § 110 (1937)).  As a general proposition that may be true, however, the Restatement, which Arizona courts follow absent contrary Arizona law, *see id.*, also recognizes that "[a] person who has entered into a transaction with another under such circumstances that, because of a mistake, he would be entitled to restitution from the other, is entitled to restitution from a third person who had notice of the circumstances before giving value."  Restatement (First) of Restitution § 13 (1937).  The Court disagrees with Global Guru that by receiving a benefit from a third party, that fact necessarily means that Xfinity did not confer a benefit on Global Guru.  *See Span*, 437 P.3d at 887 ("unjust enrichment requires consideration of the overall context of the transaction.").

The issue here, of course, is the evidence underlying the transactions.  Again, like the tortious interference claims, Xfinity has failed to establish that any benefit Global Guru received from a particular financed device corresponds to a detriment suffered from a failure to pay an installment contract on that device.  This point addresses those phones that customers financed, not those obtained by unidentified fraudsters.  To show a

connection, Xfinity could have established that the customer obtained the device with no intent to pay, sold the device to Global Guru, in which it then sold for profit, and the customer failed to pay on its agreements or maintain a service line. From what the Court can identify, there are only two transactions remotely close to this scenario. The Court previously addressed the customer who obtained a phone for $0 with credits applied to his account, but that does not evince a failure to pay on any obligations causing a detriment to Xfinity. The other transaction relates to the seller indicating that she would not be able to make payments on the device, so it would soon be blocklisted. (*See* Doc. 226 ¶ 14.) Notably, however, there is no evidence that she financed the phone through Xfinity, as opposed to through a manufacturer, e.g., Apple, or retailer, e.g., BestBuy. This evidence is insufficient to reasonably infer that she not only failed to pay, assuming she did not use the payment from Global Guru to cover her obligation, but also that she owed any unpaid amount to Xfinity. Therefore, the Court finds that Xfinity relies on insufficient evidence and speculation to sustain its unjust enrichment claim relating to financed phones.

Regarding fraudulently obtained phones, Xfinity has also presented some evidence of Global Guru's profiteering efforts. Xfinity has presented a declaration and a list of devices supporting that Global Guru offered to sell devices were fraudulently obtained or stolen by unidentified parties and resulted in a total loss. (*See* Doc. 226-3 at 6–7, 39–47.) Global Guru only disputes whether number of phones is accurate. (*See* Doc. 205 ¶ 40(a)(iii), (b); Doc. 230 ¶¶ 12, 53.)[11] It is not clear that the individual selling the device is the party responsible for fraudulently obtaining the device. Xfinity, however, has provided a list tracking the IMEI numbers of at last some of these devices, the price Global Guru paid, and the corresponding selling price. (*See* Doc. 210-3 at 1–12.) From these figures, Global Guru's benefit is ascertainable by deriving its profit from selling fraudulently obtained devices. *See Pyeatte v. Pyeatte*, 661 P.2d 196, 202 (Ariz. Ct. App. 1982) ("A benefit may be any type of advantage, including that which saves the recipient

---

[11] On that point, Global Guru's narrow dispute does not raise a genuine dispute of fact. Mr. Zahara ran the IMEIs through a third-party website and admits that he did not have access to the actual blocklist. (Doc. 230-1 ¶¶ 35–38.)

from any loss or expense.").  Likewise, Xfinity can show a detriment connected to the sale because it absorbed the loss on the device after it expected to recoup the costs through installment payments or service agreements.

The only remaining issues with respect to fraudulently obtained devices that are then sold to and then resold by Global Guru is whether it lacks a justification and whether Xfinity lacks a remedy at law.  There is no dispute that Xfinity lacks a remedy at law.  The Court need not determine that Global Guru intended to compensate Xfinity for the benefit it derived or that Xfinity intended for Global Guru to make the compensation. *Murdock-Bryant Const., Inc. v. Pearson*, 703 P.2d 1197, 1203 (Ariz. 1985) (explaining that unjust enrichment is an obligation implied in law without reference to the parties' intentions); *see also Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 283 P.3d 45, 50–51 (Ariz. Ct. App. 2012) (noting "unjust enrichment should not be used to saddle entities with expenses they chose not to incur" but may involve liability based on improper conduct).

To justify its purchases, sales, and resulting profits, Global Guru advances that it paid fair value in arms-length transactions for the devices and receives no discount over the fair value of the devices.  (Doc. 210 at 15; Doc. 228 at 16.)  Apparently, Global Guru's position is that a device's baggage has no bearing on the price it pays or for which it sells the device, rather the condition and functionality guides the price.  (Doc. 228 at 16.)  In turn, Xfinity argues the evidence shows that Global Guru purchased brand new, sealed devices for substantially less than the fair market value reflecting the retail price of brand new, sealed devices and profited from that discount.  (Doc. 236 at 11.)  Of note, by using the retail price, Xfinity's ultimate calculation for enrichment is disconnected from the fundamental economic reality that most goods sold in a secondary market are purchased for less than price a person would pay at a retailer for the same good.  While Xfinity has not shown that Global Guru profited from illicit devices over the amount it would have from a similar non-illicit device, Global Guru's argument calls for a hypothetical distinction that may not make a material difference.  A reasonably jury could find that the mere possibility that Global Guru could have profited from a different device does not

absolve it from selling the illicit device absent additional circumstances or justifications.

Looking at the circumstances surrounding the transactions, and as Xfinity contends, Global Guru created the marketplace and solicited the sales of Xfinity phones, including blocklisted devices. (Doc. 224 at 12; Doc. 236 at 9, 10 n.4.) There is no genuine dispute that Global Guru utilized search engine optimization based on keywords involving financed and blocklisted devices to drive customers its website. Xfinity has indicated that it plans to offer testimony from its Director of Compliance regarding the specific fraudulently obtained devices that he identified in Global Guru's inventory that it later resold. (Doc. 226 at 17–18 ¶ 28; *see also* Doc. 226-3 ¶¶ 1, 21–25.) Global Guru acknowledges that there is a somewhat specialized market for blocklisted devices, which other resellers avoid, and that the market comes with a risk of litigation by companies like Xfinity. (Doc. 226-2 at 24.) Global Guru admits that it conveys to its customers that is specializes in buying locked devices. (Doc. 230 ¶¶ 49–50.) It also admits that as the quantity of devices a customer seeks to sell increases, so does the likelihood the seller does not have a legitimate reason to possess them. (Doc. 230 ¶ 56.) While Global Guru checks the devices for functionality, it claims that its due diligence is not related to whether a device is blocklisted. (Doc. 230-1 at 1–2.) At the same time, however, Global Guru also claims that its system flags customers selling ten or more devices or a certain total dollar amount, inducing Global Guru to follow up with the customer and investigate the reasons for the sale. (*See* Doc. 226-7 at 23–34; Doc. 205-2 at 13–17.) The evidence further shows that Global Guru bought and sold multiple devices from single customers that were blocklisted due to fraud and total losses to Xfinity. (Doc. 226 ¶ 21.)

Under these facts, there is a genuine dispute remains about whether there is an absence of justification for Global Guru profiting from selling illicit devices. Global Guru may not have participated in the fraudsters obtaining the devices in a tortious sense, *see A Flooring System*, 772 P.2d at 581, but Global Guru targeted and specialized in locked devices and willingly engaged in a grey market in which fraudsters have every incentive to conceal the nature of their goods. There are sufficient facts for a reasonable jury to infer

1    that Global Guru bought these devices aware of and acquiesced in a known risk that the

2    devices were the byproduct of fraud and profiteered anyway.  Whether Global Guru is

3    feigning ignorance or innocence, and therefore whether it unjustly enriched itself to

4    Xfinity's detriment, is for a jury to decide.

5         Therefore, the Court will grant partial summary judgment for Global Guru relating

6    to unjust enrichment claim based on transactions pertaining to financed phones absent

7    fraud and deny summary judgment in all other respects for both parties.

8         **E.  Fraudulent Misrepresentation**

9         Under Arizona law, a showing of fraudulent misrepresentation requires: (1) "a false

10   material representation[,]" (2) "made with the speaker's knowledge of its falsity or

11   ignorance of its truth and with the intent that it be acted upon by the listener"; (3) "the

12   listener's ignorance of its falsity, reliance on its truth, and the right to rely on its truth"; and

13   (4) "consequent and proximate injury."  *Dillon v. Zeneca Corp.*, 42 P.3d 598, 603 (Ariz.

14   Ct. App. 2002).  A claim for fraud requires proof of nine elements by clear and convincing

15   evidence: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge

16   of its falsity or ignorance of its truth; (5) the speaker's intent that it be acted upon by the

17   recipient in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity;

18   (7) the hearer's reliance on its truth; (8) the hearer's right to rely on it; (9) the hearer's

19   consequent and proximate injury.  *Comerica Bank v. Mahmoodi*, 229 P.3d 1031, 1033–34

20   (Ariz. Ct. App. 2010).

21        Global Guru argues that it is entitled to summary judgment because there is no

22   evidence of any false representations to Xfinity.  (Doc. 210 at 15–16.)  Xfinity does not

23   present any actual evidence of a false representation by any named Defendant, and instead

24   relies on arguing there is sufficient circumstantial evidence showing that any one of the

25   named Defendants incentivized repeat customers to make false statements to Xfinity to get

26   the phones.  (Doc. 224 at 14–15.)  Xfinity relies general information about mysterious

27   fraudsters who have allegedly impersonated real customers to order phones on their

28   accounts, used fake identities to obtain the phones, or falsely indicated that they would

- 24 -

1   abide by Xfinity's Terms and Conditions.  (*Id.*)  Any tortious misconduct relates to third

2   parties not before the Court.

3          Xfinity has failed to point the Court to any specific evidence substantiating (1)

4   whatever fraud Global Guru committed to obtain any of the phones in this case; (2) that

5   any of the people who sold phones to Global Guru said anything about how they obtained

6   the phones, (3) that any named Defendant directed any buyer to lie to Xfinity, to use a

7   stolen identity, or otherwise fraudulently obtain the phones, or (4) any statements from

8   customers that induced Xfinity to provide them with a phone that the customer then sold

9   to Global Guru.  While it is true that knowledge of the false representation may be inferred

10  by circumstantial evidence, there must still be "some evidence on which that inference is

11  based."  *Accord Trucking, Inc. v. FedEx Ground Package Sys., Inc.*, No. 1 CA-CV

12  23-0710, 2024 WL 4602133, at \*9 (Ariz. Ct. App. Oct. 29, 2024).  Fraud requires more

13  than "doubtful, vague, speculative, or inconclusive evidence."  *Id.* at \*9 (quoting *Honk v*

14  *Karlsoon*, 292 P.2d 455, 460 (Ariz. 1956)).  Xfinity's circumstantial evidence falls short.

15  As the Court has explained, this is at best an issue of unjust enrichment, not common law

16  fraud.  Therefore, the Court will grant summary judgment for Global Guru on this claim.

17          **F.  Trafficking in Computer Passwords & Unauthorized Access**

18          All three claims fall under 18 U.S.C. § 1030.  The trafficking in computer passwords

19  claim requires a plaintiff to establish that the defendant "knowingly and with the intent to

20  defraud traffics . . . in any password or similar information through which a computer may

21  be accessed without authorization."  18 U.S.C. § 1030(a)(6).  The unauthorized access

22  claim requires establishing the defendant "intentionally access a protected computer

23  without authorization, and as a result of such conduct, causes damage and loss."  *Id.*

24  § 1030(a)(5)(C).  And last, the unauthorized access with intent to defraud claims requires

25  establishing the defendant "knowing and with the intent to defraud, accessed a protected

26  computer without authorization, and by means of such conduct furthers the intended fraud

27  and obtains anything of value."  18 U.S.C. § 1030(a)(4).

28          Global Guru moves for summary judgment on all three claims, arguing the CFAA

concerns hacking, not the conduct at issue in this case, and that Xfinity has no evidence that Global Guru knowingly trafficked in any computer passwords, nor any evidence that they accessed any of Xfinity's protected computers without authorization. (Doc. 210 at 16–17.) Xfinity claims that there is evidence that (1) Global Guru knowingly buys blocklisted phones; (2) the customers selling the phones obtained them through fraud; (3) Global Guru sells the phones in countries without the Xfinity network; (4) Global Guru accessed the Xfinity network, which is connected to Xfinity's computers, without authorization by turning on the phones; (5) Global Guru would install and remove apps from the phones before selling them; and (6) Global Guru hired an investigator to identify and investigate the scheme. (Doc. 224 at 17–18; *see also* Doc. 226 at 18–19 ¶¶ 25–32.) In reply, Global Guru maintains that there is no evidence to tie it to the unnamed fraudsters and there is no evidence it manipulated the devices' information to facilitate trafficking them. (Doc. 241 at 10–11.)

All three claims involve a defendant alleged to have "access[ed]" a computer or protected computer "without authorization" or traffic passwords or similar information enabling such access without authorization. 18 U.S.C. § 1030(a)(4), (5)(C), (6). "In the computing context, 'access' references the act of entering a computer 'system itself' or a particular 'part of a computer system,' such as files, folders, or databases." *Van Buren v. United States*, 593 U.S. 374, 388 (2021). In Xfinity's view, each phone contains proprietary software that functions as a code that automatically enables the device to access the Xfinity Mobile Network when turned on and only customers in good standing are authorized to access the network. (Doc. 226 ¶¶ 40–42; Doc. 229-5 ¶¶ 5–6.) Assuming this is sufficient to constitute access, the issue becomes whether access was "without authorization" or if Global Guru trafficked information that enables access to the network without authorization.

The CFAA is "concerned with hacking, which is why it also prohibits accessing a computer 'without authorization.'" *United States v. Nosal*, 676 F.3d 854 (9th Cir. 2012). The term "authorization," in this context, generally means "permission or power granted

by an authority." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009). The Ninth Circuit has interpreted "without authorization" as occurring in situations where "a person circumvents a computer's generally applicable rules regarding access permissions, such as username and password requirements, to gain access to a computer." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1200–01 (9th Cir. 2022); *see also Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) (finding the defendant arguably had permission to access Facebook's computers because the defendant's users permitted it to access Facebook's computers, reasoning it was akin to allowing a friend use a computer or log into an email account). "[W]hen a computer network generally permits public access to its data, a user accessing that publicly available data will not constitute access without authorization under the CFAA." *hiQ Labs*, 31 F.4th at 1200–02; *see also Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1262 (N.D. Cal. 2022) ("[W]ithout authorization is predicated on the general public lacking authorization to access the material at issue at all."). The inquiry focuses on the computer owner's conduct, not the accessor's state of mind. *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1180 (E.D. Cal. 2010).

Xfinity has conceivably permitted any one to access its network by virtue possessing a phone and turning it on anyone capable of turning on an Xfinity-enabled device has access to the network. This fact is fatal to Xfinity's claims. Xfinity has not provided any information about its security protocols, any authentication measures, or any requirements imposed on a user powering on a device that constrain the public's ability to access the network. Turning the device on is a function of the device itself and independent from the code enabling access to the network. In this regard, Xfinity has not put any constraints on the mechanism by which the public accesses the network. Beyond turning the phone on, Xfinity has provided no evidence or explanation about how Global Guru gains access to the network. Turning the device on to delete applications from the device itself does not necessarily implicate accessing Xfinity's systems. Any inference from here would require improper speculation. Therefore, the Court finds that Xfinity has not shown that Global

Guru accessed the network by means not available to the general public.

Xfinity has also failed to establish that Global Guru trafficked in information covered by the CFAA. *See Van Buren*, 593 U.S. at 390 ("[Section 1030(a)(6)] contemplates a 'specific type of authorization—that is, authentication,' which turns on whether a user's credentials allow him to proceed past a computer's access gate."). Xfinity's lone allegation pertaining to the information is that every time Global Guru sold a phone, it transferred the code to the customer that allowed access to the network. (Doc. 226 ¶ 42.) This argument is seemingly incompatible with its main theory that Global Guru traffics phones to international markets where the Xfinity Mobile Network does not operate. But regardless, Xfinity has not shown that there are any authentication measures beyond powering on the device—again, a function of the device independent of the code—that effectuates accessing the network. Therefore, Xfinity has failed to create a genuine dispute that Global Guru traffics the necessary information.

Xfinity has not adequately shown it has suffered cognizable damages under the statutory scheme to sustain its claims. While violations give rise to civil liability under 15 U.S.C. § 1030(g), the provisions specify what kinds of "damage" or "loss" a plaintiff may recover. The CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8). "The term 'loss' likewise relates to costs caused by harm to computer data, programs, systems, or information services." *Van Buren*, 593 U.S. at 391 (citing 18 U.S.C. § 1030(e)(11)). As the Supreme Court has explained, "[t]he statutory definitions of 'damage' and 'loss' thus focus on technological harms—such as the corruption of files—of the type unauthorized users cause to computer systems and data. Limiting 'damage' and 'loss' in this way makes sense in a scheme 'aimed at preventing the typical consequences of hacking.'" *Id.* at 391–92 (citation omitted) (noting the definitions are ill-fitted to remediate misuse).[12]

---

[12] 18 U.S.C. § 1030(e)(11) defines the term "loss" to mean "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."

First, the authorized access claim under § 1030(a)(5)(C) requires the intrusion to cause "damage and loss." 18 U.S.C. § 1030(a)(5)(C). Xfinity does not allege it suffered any "damage," only that it suffered "loss" related to hiring the investigator. (Doc. 224 at 18 n.10.) The Court cannot ignore the plain language of the statue, and therefore this claim also necessarily fails on this ground.

Next, Xfinity's evidence pertaining to a "loss" falls short. Courts have interpreted the definition of "loss" to make "clear Congress's intent to restrict civil actions . . . to the traditional computer 'hacker' scenario—where the hacker deletes information, infects computers, or crashes networks." *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1185 (E.D. Cal. 2010). It does not cover economic harm unrelated to the computer systems. *Lukasian House, LLC v. Ample Int'l, Inc.*, No. CV-11-6449-JFW (FMOx), 2012 WL 13009130, at *3 (C.D. Cal. Apr. 20, 2012). Xfinity's only evidence of loss relates to a declaration from its investigator but there are no facts or statements to support what that investigation entailed. (*See* Doc. 232 at 2–7; Doc. 232-2 at 2–3.) And even if this broad assertion encompasses an investigation into conduct violative of the CFAA, Xfinity has not showed that it suffered any technological harms relating to trafficking of passwords or hacking. *See Van Buren*, 593 U.S. at 391; *hiQ Labs*, 31 F.4th at 1195 n.12. To infer such harms would require the Court to speculate based on the existence of facts not presented. *See Lakeside-Scott*, 556 F.3d at 802–03 (noting courts need not draw inferences based solely on speculation). Therefore, the Court alternatively finds Xfinity has failed to establish it suffered covered losses or damages to support its CFAA claims.

Accordingly, the Court will grant summary judgment for Global Guru on these claims.

### G. Global Guru Holdings, LLC

Global Guru moves for summary judgment in favor of Defendant Global Guru Holdings on all claims, arguing the entity is not involved in this matter. (Doc. 210 at 17.) Xfinity argues Global Guru Holdings and GGT are nothing more than Zahara's alter egos. (Doc. 224 at 5–6.) In reply, Global Guru characterizes Xfinity's alter ego theory as a

1  reverse piercing of the corporate veil argument, which it contends is inapplicable here.
2  (Doc. 241 at 2.)

3      Arizona courts will disregard the corporate entity and pierce the corporate veil if a
4  plaintiff shows: (1) that the corporation is the alter ego or business conduit of a person; and
5  (2) that disregarding the corporation's separate status is necessary to prevent injustice or
6  fraud. *KeyBank Nat'l Ass'n v. Neumann Dermatology LLC*, No. CV-21-00133-PHX-JJT,
7  2022 WL 16635372, at *3 (D. Ariz. Nov. 2, 2022) (cleaned up).  To establish liability,
8  Xfinity must show that unity of control exists and that observance of the corporate entity
9  would sanction a fraud or injustice. *Keg Restaurants Ariz., Inc. v. Jones*, 375 P.3d 1173,
10 1182 (Ariz. Ct. App. 2016).  Reverse-piercing involves attempting to hold a corporation
11 liable for the debts of its owners. *Sonoma Cnty. Chevrolet, Inc. v. Hardesty*, No. 1 CA-CV
12 14-0088, 2015 WL 848195, at *1 n.2 (Ariz. Ct. App. Feb. 26, 2015).

13     While it appears that Zahara is the sole employee, owner, operator, and controller
14 of both GGT and Global Guru Holdings, (Doc. 226 at 11 ¶¶ 4–5), Xfinity has failed to
15 support the second prong—the necessity of preventing a fraud or injustice.  There are no
16 facts to support that GGT to Zahara utilize Global Guru Holdings in any manner to
17 perpetuate a fraud.  There is also no evidence to support that GGT or Zahara use Global
18 Guru Holdings to commit any wrong against Xfinity.  Zahara has provided a declaration
19 that he formed Global Guru Holdings but that the entity has never conducted any business
20 and has never had a bank account, assets, or any customers.  (Doc. 230-1 ¶ 4.)  At this
21 point, the allegations related to the claims discussed involve only Zahara and GGT.  There
22 is no evidence to suggest Global Guru Holdings is used to perpetuate a fraud or injustice.
23 Therefore, the Court will grant summary judgment in Global Guru's favor and dismiss
24 Global Guru Holdings from this action.[13]

## IV.    CONCLUSION

26     **IT IS ORDERED granting** Defendants' Motion for Leave to File Certain Portions
27 of Defendants' Response to Motion for Summary Judgment and Exhibits 4, 5, 10 and 11

[13] Global Guru also requests an award of attorney's fees.  (Doc. 210 at 17.)  The Court declines to award any attorney's fees or costs at this time.

of the Response and the Entire Controverting Statement of Facts and Exhibits Under Seal (Doc. 227).  The Clerk of the Court is directed to file the proposed unredacted versions of those documents filed at Doc. 228 and Doc. 230 under seal.

**IT IS FURTHER ORDERED granting** Plaintiffs' Motion for Leave to Seal Plaintiffs' Reply in Support of Motion for Partial Summary Judgment (Doc. 235).  The Clerk of the Court is directed to file the proposed unredacted versions of those documents filed at Doc. 231, Doc. 232, and Doc. 236 under seal.

**IT IS FURTHER ORDERED granting in part and denying in part** Defendants' Motion for Summary Judgment (Doc. 209; Doc. 210) as follows.  The Court will grant Defendants' Motion with respect to Counts I, II, III, V, VI, VII, VIII, IX, X, and Plaintiffs' alter ego theory against Defendant Global Guru Holdings, LLC and dismiss the same as contained in Plaintiffs' Second Amended Complaint for Damages and Injunctive Relief (Doc. 143.)  The Court will also grant partial summary judgment for Defendants on Count IV relating to the unjust enrichment claim as outlined in this Order.  The Court will deny Defendants' Motion with respect to Count IV in all other aspects and the standing issues.

**IT IS FURTHER ORDERED** instructing the Clerk of the Court to terminate Defendant Global Guru Holdings, LLC from this case.

**IT IS FURTHER ORDERED denying** Plaintiffs' Motion for Partial Summary Judgment (Doc. 203; Doc. 214; Doc. 220).

Dated this 13th day of May, 2025.

Honorable Susan M. Brnovich
United States District Judge